Robert E. Wilson III, Plaintiff,

against
Daniel Valente Dantas, OPPORTUNITY EQUITY PARTNERS, LTD., OPPORTUNITY EQUITY PARTNERS, L.P., and OPPORTUNITY INVEST II, Inc., Defendants.


650915/12

For plaintiff: Terrence G. Reed, Esq., of Lankford & Reed, PLLC
For defendants: Philip C. Korologos, Esq., of Boies, schiller & Flexner LLP


Charles E. Ramos, J.

In motion sequence 010, defendants Daniel Valente Dantas, Opportunity Equity Partners, Ltd. and Opportunity Invest II, Inc. move for summary judgment dismissing the amended complaint (complaint) in its entirety.
In motion sequence 015, plaintiff Robert E. Wilson III moves for partial summary judgment as to liability. 
Background
This action arises out of the privatization of certain government-owned enterprises in Brazil in the 1990s in response to the country's economic troubles. Wilson, a Citibank employee at the time, alleges that he and Dantas, a Brazilian citizen, devised and promoted a side-by-side investment [FN1]
joint venture in order to enable Citibank to invest in the purchase, management and [*2]resale of controlling interests in recently privatized Brazilian enterprises. 
Due to U.S. regulations that precluded Citibank from directly investing in Brazil, the joint venturers, namely, Wilson, Dantas, Citibank and several other Brazilian nationals, formed a Cayman Islands investment fund partnership, called the Opportunity Equity Partners, L.P. (OEP LP).
In order to manage Opportunity Equity Partners, L.P., the parties created a general partnership entity known as Opportunity Equity Partners, Ltd. (OEP/general partner), which was the general partner of OEP LP. Dantas established Opportunity Invest II, Inc. (OI-II), as a co-investment entity, and it is the ninety-six percent shareholder of OEP/general partner. Dantas is also the beneficial owner of the entire share capital of OI-II, which is allegedly the alter ego of Dantas.[FN2]

Wilson moved to Brazil in 1997 in order to assist with the management of the joint venture as an employee, shareholder, director and fiduciary of OEP/the general partner with a one percent ownership interest in OEP/general partner. The shareholders agreement contained the terms of compensation, ownership interest of the various shareholders, and entitlement to profit participation. 
In addition to the shareholders agreement, the parties drafted several other agreements to implement the joint venture, including a limited partnership agreement between Citibank entities and the investment funds, and an operating agreement, which sets forth the terms of the investment program between the investment funds and co-investors. The operating agreement designates Wilson and Dantas, amongst others, as directors of OEP/general partner, The parties refer to the investment funds as the Offshore fund, Brazilian Pension funds, and the Opportunity funds (together, the Funds). 
The parties met in New York in December 1997 and executed all three agreements. The agreements reflect that OEP/general partner was to serve as investment manager of the Funds on behalf of the corporate partnership established under the limited partnership agreement (OEP LP) in exchange for a management fee, which was to cover its operating expenses (i.e. compensation of its directors), and a share of the profit participation of the Funds' carried interest, which was otherwise due Citibank and its affiliated entities. 
Wilson alleges that Dantas orally promised that he would receive five percent of the profit participation, or "carried interest," earned by the Funds and otherwise owed to Citibank and its affiliated entities (Wilson Aff., ¶ 7-8). 
According to Wilson, from 1997 through 2008, he consistently performed the tasks and role of a partner, promoter, director and fiduciary on behalf of OEP/general partner (Wilson Aff.). During this same period, OEP/general partner made ten large investments in privatizing Brazilian companies through the Funds, resulting in billions of dollars in profits for Citibank. 
2005 Citibank SDNY Action 
In 2005, Citibank terminated OEP as general partner of the venture, appointed a successor general partner, and OEP/general partner ceased to operate. Thereafter, Citibank commenced an action against defendants in the Southern District of New York (2005 Citibank SDNY action). [*3]Citibank alleged in the 2005 Citibank SDNY action that OEP/general partner and Dantas, as its managing director, breached fiduciary and contractual obligations under the operating and limited partnership agreements. Wilson was not a party to that litigation. The parties to the 2005 Citibank SDNY action settled in 2008 in a confidential settlement agreement to which Wilson was not privy. 
Wilson alleges in this action that Dantas and defendants wrongfully excluded him from negotiations leading to the settlement agreement of the 2005 Citibank SDNY action, which resulted in the distribution of OEP/general partner's profits between Citibank and defendants, including the portion of carried interest to which Wilson claims entitlement under the oral agreement that he previously reached with Dantas (Wilson Aff., ¶ 19). In addition, Wilson claims that defendants failed to disclose that Dantas was motivated to enter into the settlement agreement with Citibank in order to prevent his continued criminal prosecution in Brazil (Wilson Aff., ¶ 19).
According to Wilson, Dantas reaffirmed Wilson's five percent profit participation share by orally promising him that Wilson's stake would be distributed out of the settlement proceeds of the 2005 Citibank SDNY action. The oral promise is allegedly memorialized in an April 2008 letter (April 2008 confirming letter) (Wilson Aff., ¶ 23; Wilson 4/13/08 letter, NYSCEF Doc No 305). As a result of Dantas's 2008 oral promise, Wilson alleges that he was induced to take no action with regard to the settlement of the 2005 Citibank SDNY action vis-a-vis Citibank, to his detriment.
In February 2011, Wilson sought to exercise his irrevocable put option for his share of OEP/general partner under Annex A to the shareholders agreement. Dantas refused to buy Wilson's share, and claimed that because Annex A to the shareholders agreement was incomplete, the irrevocable put option set forth therein was void. The following month, Wilson commenced a federal action against Citibank and the defendants in the Southern District of New York. The district court dismissed the action without prejudice for lack of subject matter jurisdiction. 
Procedural History of this Action
The following year, Wilson commenced this action against Citibank and defendants. In the complaint, Wilson alleges that defendants earned billions of dollars in profits but failed to pay his five percent profit participation that the Funds earned and that Dantas promised him. Citibank removed the action to the Southern District of New York and obtained a dismissal of the claims against it for failure to state a claim (Wilson v Dantas, 2013 WL 92999 [SDNY 2013], affirmed 746 F3d 530 [2d Cir 2014]). The remainder of Wilson's claims against defendants were remanded to this Court.
This Court previously granted defendants' motion to dismiss for lack of personal jurisdiction. In April 2015, the First Department modified the Court's order, and partially reinstated the complaint, while dismissing the claim for tortious interference with contract (Wilson v Dantas, 128 AD3d 176 [1st Dept], affirmed 29 NY3d 1051 [2017]). Wilson subsequently amended his complaint and amplified certain factual allegations pertaining to the Court's jurisdiction over defendants. 
Wilson asserts claims against defendants for breach of contract, breach of fiduciary duty, promissory estoppel, quasi-contract, constructive fraud/fraudulent concealment, and unjust [*4]enrichment.
Discussion
Defendants move to dismiss the complaint on the grounds that the alleged oral agreement between Wilson and Dantas, if any, was merely an agreement to agree and was superceded by subsequent written agreements, including the shareholders agreement which contains a specific merger clause and governs the parties' relationship and compensation. Defendants argue that the remaining tort and equitable claims are duplicative of the flawed contract claims. 
In opposition and in support of his own motion for partial summary judgment as to liability on its joint venture/breach of fiduciary duty claim, Wilson maintains that the recent filing by defendants of a multi-billion dollar lawsuit in the Southern District of New York against Citibank (2017 Opportunity SDNY action) supports his theory of recovery premised upon a fiduciary relationship among the parties. In the 2017 Opportunity SDNY action, defendants claim entitlement to participation in the same stream of joint venture profits that Wilson is allegedly owed in this action.
I. Breach of Contract
In support of his breach of contract claim, Wilson alleges that he entered into an oral agreement for the formation of a joint venture with Dantas in May or June 1997, either in New York or Brazil, and defendants agreed to pay Wilson a five percent profit participation share of all of the profits generated by the Funds (Exhibit 1, annexed to the Fattaruso Aff., Wilson Dep tr 23:11-25, 24, 29:8-17; Defendants' Rule 19-A Statement, ¶ 16). 
Wilson submits that the terms of this oral joint venture agreement are memorialized by several writings, including 1) a July 15, 1997 letter; 2) the April 2008 confirming letter (Wilson Aff., ¶ 23; Wilson 4/13/08 letter, NYSCEF Doc No 305); and 3) numerous contractual provisions in the shareholders and related agreements. In his Rule 19-A Statement, Wilson also refers to a November 4, 1996 letter of intent (Wilson's Rule 19-A Statement ¶ 4; Exhibit 1, annexed to the Reed Reply Aff.). 
The July 15, 1997 letter that Wilson relies upon is addressed to Dantas and attaches a one-page "Contract Term Sheet for Employment with the General Partner" (Exhibit 8, annexed to the Fattaruso Aff.). It states that "the parties agree that Mr. Wilson will be contracted as a Partner of the General Partner," sets forth Wilson's salary as $750,000, bonus expenses and "Carried Interest 1 point," followed by the phrase "1 Point out of 20 Points (or 5%) of the General Partner's carried interest" (Id.). It also requests that Dantas "sign the document where indicated" (Id.). The definition of the term General Partner in the July 15, 1997 letter is "CVC/Opportunity Equity Partners Ltd. (Cayman Islands) and CVC/Opportunity Equity Partners Administradora de Recursos, Ltd. (Brazil)," which are purportedly the predecessors of OEP/general partner.
There is no dispute that Wilson drafted the July 15, 1997 letter, and that Dantas never delivered a signed copy of the letter back to Wilson (Defendants' Rule 19-A Statement, ¶ 29). Wilson admits that he was never paid the $750,000 salary set forth in the letter (his compensation from OEP/general partner was $600,000 annually), and the letter otherwise does not specify how the term "Carried Interest 1 point ... 1 Point out of 20 Points (or 5%) of the General Partner's carried interest," was to be calculated, made or paid.
It is undisputed that the parties executed a series of contractual agreements on December [*5]30, 1997, including the shareholders agreement, which set forth the terms of Wilson's compensation and employment. The parties expressly and specifically agreed therein that the individual principals were not partners, and the term partnership used in the shareholders' agreement, was limited to CVC/Opportunity Equity Partners, L.P., one of the Funds, rather than the individual directors (Shareholders agreement, ¶ 10 [1] [k]). 
Nonetheless, Wilson maintains that he is owed a five percent profit participation share of all profits earned by the Funds, and that this promise not only survived, but superceded, the parties' written agreements. 
Written Agreements
The shareholders agreement was executed by Wilson, Dantas, and several other individuals five months after the July 15, 1997 letter. The parties entered into the shareholders agreement with OEP/general partner, "for the purpose of regulating their relationship with each other and certain aspects of the affairs and their dealings with the Company [OEP/general partner] which acts as general partner of the partnership, OEP LP" (Shareholders agreement, Recitals [B], Exhibit 1, annexed to the Reed Aff.). The shareholders agreement, which contains a Cayman choice of law clause, lists Dantas, Wilson, OI-II, and five more individuals as shareholders in OEP/general partner, and designates them "directors." 
The shareholders agreement also expressly states that "[n]othing in this Agreement shall constitute or be deemed a partnership between any of the parties hereto and none of them shall have the authority to bind the others in any way" (Shareholders agreement, ¶ 11, exhibit 1, annexed to the Reed Aff.). 
The shareholders agreement also sets forth each individual shareholder's interest in OEP/general partner (including Wilson's) at one percent, and provides that dividends were to be paid in accordance with each shareholder's share ownership (Shareholders agreement, §§ 4[c], 13[1]). 
The shareholders agreement provides that OI-II grants the individual directors/shareholders (including Wilson) "an irrevocable put option over their Shares in the Company at a price according to" the terms set forth in Annex A (Shareholders agreement, § 12[3]). In addition, the shareholders agreement sets forth each director/shareholders interest (including Wilson's) at one percent of OEP/general partner. Wilson does not dispute any of the terms of the shareholders agreement (Wilson's Response to Defendants' Rule 19-A Statement, ¶¶ 51-54, 56). 
Annex A is defined in the shareholders agreement as incorporating "the terms and conditions pursuant to which [I] a Shareholder may put its Ordinary Shares to the Company" (Shareholders agreement, § 1[1]). Carried interest is defined in the shareholders agreement as having "the meaning given thereto in the Partnership Agreement," which refers to the "amended and restated agreement of limited partnership relating to the Partnership dated December 30, 1997"[FN3]
(Shareholders agreement, § 1[1]). 
The limited partnership agreement contains many references to the calculation, distribution, payment of, and right and entitlement of the general partner [OEP] to receive carried interest or profits earned by the Funds (Limited partnership agreement, § 5.3). The limited partnership agreement does not contain any references or direction to pay Wilson or otherwise to distribute carried interest earned by the Funds to an individual director/shareholder of OEP/general partner.
Annex A, attached to the shareholders agreement and referenced several times therein, is largely blank. It lists "Carried Interest" and "call/put upon exit" in bullet points, but contains no further detail as to whom (among the seven shareholders, including Wilson) it would be owed, how it might be calculated, implemented, or paid or any other material term.
Wilson himself testifies that Annex A was never completed, but was intended to address future agreements (Exhibit 1, annexed to the Fattaruso Aff., Wilson Dep tr 62:5-9; Wilson's Response to Defendants' Rule 19-A Statement, ¶ 60). 
In a Cayman winding up proceeding involving another OEP/general partner shareholder and employee, Luis Demarco Almeida (Demarco action), who was Wilson's co-employee and a cosignatory of the shareholders agreement, the Cayman High Court interpreted the term "carried interest" as contained in Annex A to the shareholders agreement. In that proceeding, Demarco sought to enforce a prior oral contract he allegedly entered into with Dantas pertaining to his employment, compensation and a signing-on bonus. The Cayman courts in the Demarco action determined that Annex A to the shareholders agreement did not contain any enforceable terms as to carried interest, and that "as a result the shareholders' agreement was reduced in whole or in part to an agreement to agree" (Demarco v Opportunity Equity Partners Ltd., [2006] UKPC 44, [82]). 
This Court similarly interprets Annex A, here. Annex A to the shareholders agreement does not contain sufficient detail for a court to determine what, if any, the parties intended by the bare reference to "Carried Interest" and to "Call/put option." Therefore, no express contractual right can be enforced with respect to these two terms (see Wilson, 29 NY3d at 1057-57, dissent). The mere agreement to agree, in which a material term is left for future negotiations, is unenforceable (Joseph Martin, Jr. v D. Schumacher, 52 NY2d 105 [1981]).
To the extent Wilson's claim is premised on Dantas's oral promises that are allegedly memorialized in various writings, four of these writings,[FN4]
including the July 15, 2007 letter, are [*6]dated prior to the shareholders agreement, which governs the terms of his employment and status as shareholder of OEP/general partner. The shareholders agreement contains a merger clause, which provides,
[this] "Agreement constitutes the entire agreement between the parties hereto with respect to the matters dealt with therein and supercedes any previous agreement between the parties hereto in relation to such matters ... No variation of this Agreement shall be valid or effective unless made by one or more instruments in writing signed by such of the parties hereto which would be affected by such variation" (Shareholders agreement, § 20 [9]). 
It is well-settled under both New York and Cayman law [FN5]
that a contract provision such as this one included in the shareholders agreement reflects the parties' intention that the current agreement bars parol evidence of prior or collateral agreements (Fundamental Long Term Care Holdings, LLC v Cammeby's Funding LLC, 92 AD3d 442, 449 [1st Dept], appeal dismissed 19 NY3d 963 [2012]; see also Re Atlantic Fashions Ltd., [2011] EWHC [QB] 1431 [under Cayman law]).
However, even assuming arguendo that the merger clause does not bar evidence of prior oral agreements, despite conducting extensive discovery, Wilson has failed to submit any evidence that Dantas, OEP/general partner, or the other defendants for that matter, assented to the obligations that he now seeks to enforce. "An enforceable contract requires mutual assent to its essential terms and conditions" (Express Industries and Terminal Corp. v New York State Dept. of Transp., 93 NY2d 584, 589-91, rearg denied 93 NY2d 1042 [1999]). Wilson does not dispute that he drafted both the July 15, 2007 and the April 13, 2008 letters, and requested that Dantas countersign the letters to evidence defendants' assent to its terms. It is undisputed that neither Dantas nor any other representative of OEP/general partner did so (Wilson Aff., ¶ 23; Wilson 4/13/08 letter, NYSCEF Doc No 305). 
Wilson's definition of general partner, sourced from the unsigned July 15, 1997 letter that he himself drafted, is also inconsistent with the definition of general partner set forth in the fully executed operating agreement.[FN6]
The definition of the term General Partner in the July 15, 1997 letter is CVC/Opportunity Equity Partners Ltd. (Cayman Islands) and CVC/Opportunity Equity Partners Administradora de Recursos, Ltd., the predecessors of OEP/general partner. Defendants represent, and Wilson does not challenge, that neither OEP/general partner nor Administradora received carried interest from Citibank or the Funds (Defendants' Rule 19-A Statement, ¶ 8, 120-24). 
Moreover, Wilson does not meaningfully refute defendants' representation that none of the Funds ever paid any defendants a carried interest or participation of profits earned by the [*7]Funds (Wilson's Response to defendants' Rule 19-A Statement, ¶¶ 105-110, 122, 124). 
In the 2005 SDNY Citibank action, defendants sought to have Citibank pay the carried interest that it thought was due to be paid to OEP/general partner, and Citibank refused. Citibank and defendants litigated that issue, amongst others for several years, and it was ultimately released in settlement. The 2008 settlement agreement expressly states that defendants, namely OEP/general partner, waives all right to past, present and future right to receive any carried interest distributed by the Funds (Defendants' Rule 19-A Statement, ¶ 8, 112, 120-24).
For these reasons, dismissal of the breach of contract claim is warranted.
II. Breach of Fiduciary Duty
Wilson moves for summary judgment as to liability on his claim for breach of fiduciary duty, and defendants move to dismiss the claim in its entirety based upon the language of the shareholders agreement. 
Wilson's contention is that his relationship to defendants, Dantas, the managing director of the OEP/general partner, OEP LP, and OI-II, the majority owner of OEP/general partner, is a traditional fiduciary one of trust and confidence, and contains the elements associated with promoters of a transaction, joint venturers, fiduciaries, partners and/or quasi-partners. To corroborate his claim, Wilson contends that defendants have conceded the existence of one joint venture for the side-by-side investment scheme in their prior counterclaims asserted in the 2005 Citibank SDNY action and the 2017 Opportunity SDNY action, which is the same joint venture that Wilson alleges he is a member of in this action. 
The shareholders agreement, which governs the relationship between Wilson and defendants, specifically provides that the parties did not intend to create a partnership:
"Nothing in this Agreement shall constitute or be deemed to constitute a partnership between any of the parties hereto and none of them shall have any authority to bind the others in any way."
Under applicable Cayman law,[FN7]
a contractual provision disavowing the existence of a fiduciary or partnership relationship is a strong indicator that there was, in fact, no such relationship (McKillen v Midland [Cyprus] Invs. Ltd., [2012] EWHC [Ch] 521 [94], [97]). New York law is similar (see e.g. EBCI, Inc. v Goldman Sachs, 5 NY3d 11, 31 [2005] [Where the parties have entered into a contract, courts look to the agreement to find the nexus of the parties' relationship and should ordinarily not transport the parties to the realm of higher duty]). 
Here, Wilson [FN8]
and Dantas are undisputably highly sophisticated individuals who entered into a series of written agreements that set forth the scope of their rights and duties with respect to the investment program. The shareholders agreement is the only agreement that Wilson signed in his personal capacity. The parties to the shareholders agreement expressly disclaimed [*8]the existence of a partnership. The limited partnership agreement, which Wilson signed in his capacity as a principal of OEP/general partner, expressly disclaims the existence of any third-party beneficiaries (Limited Partnership Agreement, § 13.15).
It is the law in this State that courts should avoid imposing a fiduciary or other heightened duty upon the parties when they expressly disclaim it. Both Justice Wilson of the Court of Appeals in his dissent in a prior appeal in this action (see Wilson, 29 NY3d at 1065), and the Second Circuit, in affirming the Southern District's dismissal of identical claims against Citibank, reached the same conclusion (Wilson v Dantas, 2013 WL 92999 [SDNY 2013], affirmed 746 F3d 530 [2d Cir 2014] ["A fiduciary relationship between OEP's shareholders and Citibank cannot arise by virtue of the organizational structure outlined in OEP's Shareholder Agreement"]). 
Moreover, any fiduciary duty undertaken in this context would have run only to OEP/general partner. To the extent Wilson's claim is that assets owed to him as a shareholder and fiduciary of OEP/general partner were wrongfully diverted to defendants and other corporate fiduciaries, the enforcement of such duties and recovery of such assets, if any, belongs to OEP/general partner and not to Wilson, personally (see Abrams v Donati, 66 NY2d 951, 953-54 [1985]). 
The Court rejects the contention that an issue of fact is raised by virtue of the joint venture allegations that defendants assert in the 2005 and 2017 Opportunity SDNY actions (Exhibits 2-3, annexed to the Reed Aff. [mot seq 10]). Dantas and the other defendants to those actions have consistently denied that Wilson was a member of the alleged joint venture, and their pleadings, which are undoubtedly judicial admissions, do not demonstrate otherwise. 
In those actions, defendants allege the existence of a joint venture whose participants are comprised of the Funds that invested on a side-by-side investment basis: the Onshore Fund (through which certain Brazilian pension funds invested), the CVC Fund or Off-Shore Fund (through which Citibank invested), and the Opportunity Funds (through which the Opportunity Fund and certain additional entities and third party investors participated in, including defendants) (2017 Opportunity SDNY action, ¶ 57; 2005 Citibank SDNY action, counterclaims, ¶ 50). Wilson does not allege that he was a side-by-side investor, or otherwise that he ever invested any of his own money or capital in any of the Funds (Defendants Rule 19-A Statement, ¶¶ 101, 103). In contrast, Citibank invested $750 million of its own funds, and OI-II (beneficially owned by Dantas) committed between $30 million and $100 million to the alleged joint venture. 
Apart from his compensation as a director and employee of OEP/general partner, and dividends based upon his share ownership for which there is no dispute that Wilson was paid, defendants have consistently denied that Wilson has a right to receive any of the carried interest earned and distributed by the Funds. Wilson, in his personal capacity, was not a party to and had no rights as such under the operating agreement, which is an agreement among OEP/general partner, Citibank and CVC/Opportunity Equity Partners, L.P. (defined in that agreement as the "Fund"), and largely governed the side-by-side investment scheme's purpose, structure capital contributions and distributions by and among the partners, and allocation of losses.
For these reasons, Wilson fails to demonstrate, or even raise a triable issue, that he is a participant in the "joint venture" which defendants allege was created between the Funds and [*9]their investors. 
The Court also rejects Wilson's contention that partial summary judgment in his favor is justified based upon the determination of the Cayman High Court in the Demarco action. The main issues in the Demarco action were the terms of Demarco's compensation following his termination from employment by OEP/general partner and other Opportunity investment funds, and his entitlement to sign-on benefits and a beneficial share capital in OEP/general partner. Demarco also commenced a wind-up proceeding of OEP/general partner under Cayman law, which was largely subsumed by the plenary action. The court determined that he was entitled to retain a signing-on benefit, a beneficial share capital of 3.5% of OEP/general partner (valued at $1,469,000 in 1999), and that OEP/general partner's relationship to its shareholders/directors reflected elements of a quasi-partnership under Cayman law.
The determination of the Cayman courts in the Demarco action is limited in scope and not entirely relevant to Wilson's theory of recovery, namely, that he is entitled to hundreds of millions of dollars stemming from his five percent share of the profit participation (carried interest) earned by all of the Funds. For the reasons already stated above, Wilson's claim for breach of fiduciary duty is barred by the terms of the parties' agreement, and otherwise, unsubstantiated by any evidence.
III. Promissory Estoppel
Wilson's claim for promissory estoppel, pled in the alternative, is premised on the Dantas oral profit participation promise of five percent, purportedly evidenced by the July 1997 letter, wherein Wilson sets forth his intention to move himself and his family to Brazil to undertake implementation of the joint venture, in addition to the promise made to him around the time of the 2008 settlement agreement negotiations.
A claim for promissory estoppel requires reasonable reliance on a sufficiently clear and unambiguous promise resulting in injury; generally, an oral promise will not be enforced on this ground unless it would be unconscionable to deny it (Steele v Delgerde S.R.L., 242 AD2d 414, 415 [1st Dept 1997]).
Wilson fails to raise a triable issue that he reasonably relied upon an oral promise to pay him five percent carried interest in 1997 or in 2008. These alleged oral promises are not supported by the parties' written agreements, which were heavily negotiated between sophisticated business people (Capricorn Investors III, L.P. v Coolbrands Intl., Inc., 66 AD3d 409, 409-10 [1st Dept 2009]). 
Wilson appears to have attempted to extract written confirmation of the oral promise to pay him five percent carried interest on two notable occasions (in 1997 and 2008), albeit unsuccessfully. The July 15, 1997 letter that Wilson relies upon, states: "Carried Interest 1 point," followed by the phrase "1 Point out of 20 Points (or 5%) of the General Partner's carried interest," and identifies Wilson as a partner in the general partner [FN9]
(Exhibit 8, annexed to the Fattaruso Aff.). It requests that Dantas "sign the document where indicated" (Id.). As indicated supra, Dantas never delivered a signed copy of the letter back to Wilson, and the letter otherwise [*10]does not indicate how the carried interest was to be calculated (Defendants' Rule 19-A Statement, ¶ 29).
With respect to Dantas' alleged April 2008 promise to pay Wilson from the proceeds of the 2008 settlement agreement, Wilson writes in the letter, "we agreed at our last meeting ... to initiate a final set of good faith negotiations to resolve my 5% carried interest (Exhibit 24, annexed to the Fattaruso Aff.). A mere agreement to negotiate cannot provide the requisite clear and unambiguous promise upon which Wilson could have reasonably relied upon to his detriment to sustain the promissory estoppel claim (Chatterjee Fund Mgt., L.P. v Dimensional Media Assocs., 260 AD2d 159 [1st Dept 1999]). 
Finally, to the extent Wilson contends that the main consideration for his claimed right to five percent profit participation was "bringing Citibank to the table," Wilson does not allege, let alone raise a triable issue, that the failure to pay him this amount resulted in unconscionable injury. Wilson does not dispute that he received a $600,000 annual salary from his employment as a manager and director in OEP/general partner in addition to his entitlement to receive one percent pari passu dividends under the shareholders agreement.
IV. Quasi-Contract
Wilson's quasi-contract claims for unjust enrichment, quantum meruit and monies had and received are premised on the same theories as his contractual claims, albeit, pled in the alternative.
It is well-settled that a contract cannot be implied where there is an express contract covering the same subject matter (Azimut-Benetti S.p.A v Mangum Marine Corp., 55 AD3d 483 [1st Dept 2008]). However, where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract and breach of contract, and will not be required to elect her own remedies at the outset (Kramer v Greene, 142 AD3d 438, 441-42 [1st Dept 2016]).
Here, Wilson takes inconsistent positions as to both the enforceability and scope of the written agreements. On the one hand, he does not challenge the applicability or enforceability of the agreements, and seeks contractual remedies. He also asserts that his oral agreement with defendants is entirely consistent with the contractual agreements, but that nonetheless, the contracts are themselves incomplete and thus, quasi-contractual remedies are available.
His theory does not support a claim in quasi-contract, and this Court concludes that the parties' enforceable contractual agreements covering the subject matter at issue bar recovery under quasi-contract.
With respect to unjust enrichment, a plaintiff must show that the other party was enriched at that party's expense, and that it is against equity and good conscience to permit the other party to retain what is sought to be recovered (Kramer, 142 AD3d at 442). To succeed on a claim for quantum meruit, the plaintiff must demonstrate: the performance of services in good faith; the acceptance of the services by the person to whom they are rendered; an expectation of compensation therefor; and the reasonable value of the services (Id.). 
Wilson does not raise a triable issue, nor submit any evidence, that defendants were unjustly enriched at his expense (emphasis added). Under the shareholders agreement, Wilson received substantial compensation for relocation to Brazil and for his employment. Moreover, all of the alleged rights he seeks to enforce are rooted in express contractual provisions, and he fails [*11]to raise a triable issue as to the existence of any right independent of the contractual duties which warrant restitution.
V. Constructive Fraud/Fraudulent Concealment
Wilson's claims for constructive fraud and fraudulent concealment are based upon defendants' failure to disclose the terms of the 2008 Citibank settlement agreement.
Claims for constructive fraud and fraudulent concealment require the existence of a fiduciary or confidential relationship (Vitale v Steinberg, 307 AD2d 107, 109 [1st Dept 2003]), in addition to justifiable reliance (ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 25 NY3d 1043, 1044 [2015]).
Both claims fail, as Wilson is unable to raise a triable issue that defendants had a duty to disclose the settlement agreement or that he justifiably relied upon Dantas's alleged oral promises, in light of the express contractual provisions of the various agreements. 
VI. Equitable Relief (Equitable Accounting)
The right to an accounting is rooted in a fiduciary relationship (see generally Kazi v General Elec. Capital Business Asset Funding Corp. of Connecticut, 116 AD3d 592 [1st Dept 2014]). The parties' contractual relationship does not give rise to a right to an accounting.
Accordingly, it is
ORDERED that defendants Dantas, Opportunity Equity Partners, Ltd. and Opportunity Invest II, Inc.'s motion (mot seq 010) for summary judgment dismissing the amended complaint is granted in its entirety; and it is further
ORDERED that plaintiff Robert E. Wilson III's motion (mot seq 015) for partial summary judgment as to liability is denied; and it is further
ORDERED that the Clerk is directed to dismiss the complaint and enter judgment in favor of defendants.
Dated: January 11, 2018



Footnotes

Footnote 1:Wilson explains that a side-by-side investment entails investing with other co-investors, and then divesting these holdings in order to maximize the return on investment and to generate profits on a pro rata basis for all participants from the divestment of the portfolio.

Footnote 2:OEP LP, OEP/general partner, OI-II and Dantas are the named defendants in this action.
Footnote 3:On December 30, 1997, OEP, as the general partner, Citibank (limited partner), and International Equity Investments, Inc. (limited partner) entered into the amended restated limited partnership agreement (limited partnership agreement), governing Citibank's $750 million investment in OEP/general partner (Exhibit 10, annexed to the Fattaruso Aff.). The terms of the limited partnership agreement expressly imposed fiduciary duties on OEP as general partner, the limited partners (Citibank and International Equity Investments, Inc.) and the individual principals/shareholders (including Wilson) owed to Citibank (Limited partnership agreement, Article 6.1.5).

Footnote 4:The parties executed the shareholders' agreement on December 30, 1997. Wilson attempts to premise his claim to five percent of the carried interest, in part, on a July 15, 1997 letter, an April 1997 shareholder resolution approval (which Wilson erroneously states is dated 2007), and a November 4, 1996 letter.
Footnote 5:The shareholders agreement specifies that it is to be governed by Cayman law. The parties do not claim that there is a conflict between New York and Cayman contract law, and the Court can discern none.

Footnote 6:The operating agreement is dated December 1997, between the general partner, Citibank, defendants, and the other shareholders/directors of OEP/general partner, who are defined therein as principals and shareholders (Exhibit 1, annexed to the Reed Aff.). The operating agreement defines shareholders as "the holders of voting securities of the [g]eneral [p]artner."

Footnote 7:The shareholders agreement specifies that it is to be governed by Cayman law, and in any event, as a shareholder of OEP/general partner, a Cayman corporation, Cayman law governs its internal affairs (Hart v General Motors Corp., 129 AD2d 179 [1st Dept], app denied 70 NY2d 608 [1987]).

Footnote 8:Wilson is a graduate of Harvard Law School.

Footnote 9:"CVC/Opportunity Equity Partners Ltd. (Cayman Islands) and CVC/Opportunity Equity Partners Administradora de Recursos, Ltd. (Brazil)," which is the predecessor of Opportunity Ltd.